UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-20715-CR-COOKE

UNITED STATES OF AMERICA,

vs.

ANITA SGARRO,
    a/k/a "Anita Simone,"

    Defendant.
_____ /

## GOVERNMENT'S SENTENCING MEMORANDUM AND OPPOSITION TO DEFENDANT SGARRO'S OBJECTIONS TO PSI

Anita Sgarro was the Mike Mesa *and* the Charles Topping on the West Coast. She hired sales people and managed an entire boiler room in California, and was also the only person authorized to "close" or "load" investors with Sanomedics stock. She specifically targeted elderly and vulnerable citizens, providing her salespeople with a "bonus" in commissions for stealing money from senior citizens' Investment Retirement Accounts (IRAs). Sgarro made numerous misrepresentations to investors to induce their purchase of Sanomedics stock, including that Sanomedics made $10 million in revenues, that the stock could be sold within a few months on the NASDAQ, and that Sanomedics was being endorsed by Cesar Millan, the Dog Whisperer. Further, Sanomedics is just the tip of the iceberg for Sgarro's investment frauds, as she perpetrated numerous other investment fraud schemes on Sanomedics victims during the same time period she sold Sanomedics stock. The Court should follow the PSI's recommendation and sentence Sgarro to 20 years in prison for these crimes.

## I. The Offense Conduct

Sgarro objects to Paragraph 8, claiming she had no involvement with Sanomedics as of 2012. That is wrong. The government introduced handwritten notes that victim witness Linda Holty wrote during a call with Sgarro in April 2013, during which Sgarro promised Holty that Sanomedics would be listed on the NASDAQ within two months.

## II. Sanomedics Fraud Scheme

Sgarro objects to the characterization in Paragraph 13 of her sales office as a "boiler room." Witnesses and documents introduced at trial specifically characterized the Sanomedics sales office as a "boiler room." Witnesses such as Marissa Livni, Jeff Astgen and Shawna Lynch also testified that Sgarro traveled and worked from the Miami office numerous times. The Court should overrule this objection.

Sgarro bickers with facts in Paragraphs 16 and 17, arguing that she used the false name Anita Simone because "it was simpler and easier for people to understand and remember." Sgarro did not testify at trial and her counsel elicited no evidence about why she used the alias Anita Simone. The government, on the other hand, introduced substantial evidence that Sgarro used an alias to conceal her true identity. Evidence at trial also showed that Sgarro told investors lies not contained in the press releases which she knew to be false and fraudulent. Sgarro's claim that she "never referred investors to Topping," meanwhile, is also belied by the evidence introduced at trial. Sgarro's salesperson, Jeff Astgen, and the Sanomedics secretary, Shawna Lynch, testified that Topping and Sgarro had a standing agreement to load each other's clients.[1]

---

[1] *See, e.g.*, Trial Tr. 57:5-16, May 22, 2017 ("Q. Based on your independent recollection, sir, did Anita ever seek help loading investors outside of her own room? A. There would be times when if she couldn't quite get them to load, she would then ask the office in Miami Lakes to attempt to close with a man's voice and see if they could load them. And then they would also send her some if they were unable to close them as well.").

2

Sgarro objects to Paragraph 19, claiming she had no information as to specifically what Mesa, Houlihan and Sizer did with the investor funds. To the contrary, the evidence at trial demonstrated that Sgarro knew that between 25-50% of investor funds were misappropriated by Mesa and Sizer for sales commissions.

Sgarro objects to Paragraphs 21-24, claiming that her other investment offerings, ADR Biz Builder, Home Based Learning Institute, World Transfers and Pacific Shore Holdings, were not fraudulent. The government will introduce evidence at sentencing concerning the fraudulent nature of these investments, including statements made by Chris Gray. Further, these other fraudulent investment offerings were inextricably intertwined with the Sanomedics fraud because they involved the same victims, methods and course of conduct as the Sanomedics fraud, and thus are appropriately included in Sgarro's loss amount at sentencing.

Sgarro denies the statements in Paragraph 25 that she earned large commissions. To the contrary, evidence at trial demonstrated that Mesa paid Sgarro a 25% commission for each investor that she induced to invest in Sanomedics.

Although a jury of her peers found, beyond a reasonable doubt, that Sgarro knowingly and intentionally defrauded investors, conspired with others, and committed wire and mail fraud, she objects to Paragraph 26 describing the basic facts alleged in the indictment and proven at trial. The trier of fact found otherwise. The Court should overrule this objection.

### III. Sentencing Guidelines Calculations and Sgarro's Objections to Same

#### a. Adjustment for Obstruction of Justice

Defendant Sgarro's conduct in this case warrants an enhancement for obstructing and impeding the administration of justice pursuant to Section 3C1.1 of the Sentencing Guidelines. Sgarro argues that the government failed to prove that she "attempt[ed] to influence [a] witness"

under U.S.S.G. § 3C1.1 when she followed Aurelia Ostro, a government witnesses, off of the Metro Mover prior to her trial testimony and told Ms. Ostro that "the truth shall set you free." Sgarro also claims that attempting to introduce a fabricated document into evidence during her trial to falsely extricate herself from the conspiracy does not qualify her for the obstruction enhancement. She is wrong.

U.S.S.G. § 3C1.1 provides for a two level increase in the offense level for a defendant who has "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense[.]" *See id*. § 3C1.1. "An example of conduct deemed 'obstructive' under § 3C1.1 is directly or indirectly attempting to threaten or intimidate a codefendant or witness." *United States v. Membrides*, 570 F. App'x 859, 861 (11th Cir. 2014) (citing U.S.S.G. § 3C1.1, cmt. 4(A)). The application notes to Section 3C1.1 provide that the adjustment for obstruction of justice also applies when a defendant "produc[es] or attempts to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding." *Id*. § 3C1.1, cmt. 4(C). "The defendant need not be successful in his attempt to impede or obstruct the administration of justice in order for the enhancement to apply." *Membrides*, 570 F. App'x at 861 (citing U.S.S.G. § 3C1.1, cmt. 4(A)).

The government established at trial that the letter Sgarro produced and attempted to admit into evidence was demonstrably fabricated to falsely extricate herself from the conspiracy. On April 21, 2017, defense counsel submitted to the government a letter prepared by Sgarro purporting to show her withdrawal from the Sanomedics conspiracy. The letter was dated July 11, 2011, and was allegedly transmitted to Mike Mesa in Miami. Sgarro, through her counsel, attempted unsuccessfully to move this letter into evidence through multiple witnesses at her trial.

4

Two trial witnesses—Sgarro's former secretary in California, Marissa Livni, and the secretary in Miami, Shawna Lynch—testified that they had never seen the letter and would have seen it had it been sent or authentic.

Livni testified that the letter was completely inconsistent with similar letters that she prepared and sent (one of which was sent on the same date, July 11, 2011), the headings were in a different font and format, and the letter did not appear legitimate. The Court stated that Livni did everything she could to "disavow" the authenticity of the document. Livni also testified that she transcribed and sent all of Sgarro's faxes, never saw Sgarro use the office fax machine, and never saw Sgarro hand sign a fax or use the name "Anita Simone Sgarro." Critically, Livni also testified that Sgarro never stopped selling the Sanomedics stock after July 11, 2011. Livni also told the FBI that, based on these factors, the letter was probably fabricated by Sgarro. *See* ECF No. 455, 122:4-130:8.

Sgarro's attorney also attempted unsuccessfully to introduce the fabricated letter through Shawna Lynch. However, Lynch testified that she had never seen the letter and confirmed that the fabricated letter was never actually sent to Mike Mesa. *See* ECF No. 456, 99:17-105:20; ECF No. 459, 26:3-28:17.

Numerous other documents introduced at trial also demonstrate that Sgarro continued her involvement with Sanomedics after the date of the fabricated letter. For example, in an email between Sgarro and Aurelia Ostro on December 23, 2011, Sgarro encouraged Ms. Ostro to purchase additional Sanomedics shares. Sgarro also spoke to another victim, Linda Holty, in April 2013 about when the Sanomedics stock would become public.

Importantly, the fact that the document was never introduced into evidence does not impact application of the enhancement. *See also United States v. Gilpatrick*, 548 F.3d 479, 485 (6th Cir.

5

2008) ("plain meaning" of application note 4(C) does not require showing that false document was material); *United States v. Martin*, 369 F.3d 1046, 1061 (8th Cir. 2004) (rejecting defendant's argument that use of backdated checks could justify application of enhancement only if the checks materially impeded the investigation); *United States v. Solano-Godines*, 120 F.3d 957, 962-63 (9th Cir. 1997) ("conduct falling within the scope of application note [4(C)] warrants the enhancement regardless of whether it actually resulted in a significant hindrance to the investigation or prosecution").

Additionally, Sgarro attempted to intimidate a trial witness, Aurelia Ostro. Sgarro confronted Ms. Ostro on the Metro Mover and told her "I think you're my witness." Sgarro then proceeded to follow Ms. Ostro off the train and said "the truth shall set you free." This incident was reported to the Court at trial and a hearing was held in which Ms. Ostro testified to these facts under oath.

This conduct is precisely what § 3C1.1 was designed to punish, and a two level adjustment for obstruction is applicable.

### b. Offense Level Computation

Sgarro claims that she should only be held responsible for the fraud losses that she personally caused. That is incorrect. The Sentencing Guidelines create a sliding scale that increases the defendant's base offense level by zero to thirty levels depending on the amount of actual or intended loss. U.S.S.G. §2B1.1(b)(1).

The Guideline commentary provides that "loss" is the greater of actual loss or intended loss. U.S.S.G. §2B1.1, cmt. 3. "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.*, cmt. 3(A)(i). "Intended loss" means the pecuniary harm that was intended to result from the offense and includes intended pecuniary harm that would have

been impossible or unlikely to occur. *Id.*, cmt. 3(A)(ii). "The court need only make a reasonable estimate of the loss." *Id.*, cmt. 3(C). The Court's loss determination is entitled to deference because "[t]he sentencing judge is in a unique position to assess the evidence and estimate the loss based upon the evidence." *Id.*

The Sentencing Guidelines provide that a defendant's base offense level includes the defendant's own acts, and, in the case of a "jointly undertaken criminal activity," it also includes "all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity; that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. §1B1.3(a)(1)(B). Several factors are relevant in determining the scope of jointly undertaken criminal activity at sentencing, including: (1) the existence of a single scheme; (2) similarities in modus operandi; (3) coordination of activities among schemers;(4) pooling of resources or profits; (5) knowledge of the scope of the scheme; and (6) length and degree of the defendant's participation in the scheme. *United States v. Sheneman*, 682 F.3d 623 (7th Cir. 2012); *United States v. Salem*, 657 F.3d 560 (7th Cir. 2011). "Thus, the district court may hold participants in a conspiracy responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy." *United States v. Hunter*, 323 F.3d 1314, 1319 (11th Cir. 2003); *see also United States v. Mateos*, 623 F.3d 1350, 1368 (11th Cir. 2010) (attributing entire intended loss to defendant in fraud scheme where it was reasonably foreseeable that a clinic engaged in fraudulently diluting doses of medicine might also be in the practice of billing Medicare for it).

Here, Sgarro should be held responsible for $20,325,000 as a result of the fraud committed by way of the Sanomedics conspiracy, and $6,461,300 for her scheme to defraud through ADR Biz Builder/Home Based Learning Institute ("ADR/HBLI"), and $1,288,7650 for her scheme to defraud through Pacific Shore Holdings, for a total loss amount of $28,075,065. All of these were schemes to defraud investors that used a similar manner, used coordination with other boiler room sales representatives, and were perpetrated on the same or similar victims.

As to Sanomedics, Sgarro engaged in a jointly undertaken criminal activity with numerous co-conspirators. Sgarro, Mesa, Sizer, and their salespeople all focused on vulnerable victims that they targeted to defraud. Once they found a good lead, that is, someone that they could con out of their hard-earned money, they worked together to extract as much money from the victims as possible through lies and deceit. As the only "closer" or "loader" in the California boiler room, Sgarro directly benefited from her and her co-conspirators' misconduct, earning a percentage of the stolen funds and gaining access to his co-conspirators' victims to load with additional stock. Also, the fact that Sgarro was the manager and leader of the California office shows that her, Mesa and Sizer had a united goal, a goal that Sgarro would abide by. Because the Sanomedics fraud's total pecuniary harm was reasonably foreseeable to Sgarro, she should be held responsible for the total loss.

Additionally, during the same time period that she sold Sanomedics, Sgarro sold investments in other similar investment frauds to Sanomedics victims. These victims suffered substantial additional losses due to Sgarro's uncharged fraudulent schemes. Based on bank account records generated by the FBI's forensic accountant and the FBI's investigation, Sgarro's uncharged frauds caused an estimated $7 million in additional victim losses.

Between 2012 and 2013, Sgarro induced William Welch to purchase $180,000 in Sanomedics stock by making numerous materially false statements, including that she would receive no commissions or fees on Mr. Welch's investment, that she was paid in shares of Sanomedics stock, and that John Sculley, the former CEO of Apple, was associated with Sanomedics. Soon after Mr. Welch invested in Sanomedics, Sgarro convinced him to purchase shares in another company called ADR Biz Builder, also known as the Home Base Learning Institute (collectively, "ADR/HBLI"). Sgarro told Mr. Welch that ADR/HBLI was an online college university program, that she was selling the stock at 25 cents per share and projected the stock to reach between $10 and $25 per share, and that she received no commissions or fees and was only paid in shares of ADR/HBLI. Mr. Welch invested approximately $715,000 in ADR/HBLI and listed Sgarro as the fundraiser. Sgarro also convinced him to withdraw at least $240,000 from his IRA account in order to purchase more stock.

Sgarro subsequently informed Mr. Welch that his investments in ADR/HBLI were no longer doing well. She also informed him that, without his authorization, she had moved his entire investment into a new company called Searchable, a/k/a MobiDart or Deep Rock Ventures ("Searchable"). Sgarro said Searchable provided a list of commonly used services for new residents of cities. Sgarro advised Mr. Welch that he could instead opt to receive his money back, but encouraged him to continue his investment in Searchable by explaining that she was not receiving any commissions or fees for selling Searchable and was paid in company stock. Mr. Welch advised Sgarro that he never authorized the transfer of his investment and elected to have his investment returned to him. Sgarro provided Mr. Welch with a hand-written promissory note for $1,544,000, but he has never received any of his investment back.

In addition to Mr. Welch:

- Samuel Charles Strauss informed FBI agents that after he invested in Sanomedics, Sgarro contacted him using her alias "Anita Simone" and convinced him to invest in ADR/HBLI. Sgarro later told him that ADR/HBLI had changed its name to "Searchable" because the company could not raise enough funds to pursue its online education business. Sgarro also tried to convince Mr. Strauss to invest in a third company called "Beautimedics," which he declined to purchase.

- Donald Buhler informed FBI agents and provided supporting documents demonstrating that after he invested in Sanomedics, Sgarro, using her alias, Anita Simone, convinced him to invest an additional $100,000 in ADR/HBLI and $50,000 in a company called Pacific Shore Holdings. Mr. Buhler also informed agents that Sgarro offered to visit him to perform sexual favors in an attempt to persuade him to invest additional funds, even after she learned that Mr. Buhler was caring for his sick wife.

- Earl Brewer informed FBI agents that, in addition to his $37,000 Sanomedics loss, he also lost $40,000 after Sgarro induced him to invest in World Transfers.

- Aurelia Ostro told FBI agents and provided supporting documents demonstrating that she also invested in Pacific Shore Holdings and World Transfers and that she spoke to Sgarro about her role in those schemes. Ms. Ostro stated that, similar to her Sanomedics stock, her Pacific Shore Holdings stock has not appreciated since her purchase, that she is worried Pacific Shore Holdings is also a "scam," and that she is "out of luck" regarding her World Transfers investment.

- Harry Johnson also informed agents and provided documents demonstrating that Sgarro solicited him to invest in ADR/HBLI. Sgarro sent many of these solicitations via email in which she represented herself to be the "Chief Marketing Officer and Director of Investor Relations" at ADR/HBLI.

- Jeff Astgen, a former salesperson who worked for Sgarro selling shares of both Sanomedics and World Transfers, informed agents and testified at trial that Sgarro ran the sales room for World Transfers and used the false and fraudulent name "Anita Simone" to sell shares of World Transfers, just as she did to sell shares of Sanomedics. Astgen also informed agents that when World Transfers "ended," those shares were rolled over into Pacific Shore Holdings. Sgarro and her salespeople earned large commissions for selling World Transfers and Pacific Shore Holdings.

- Chris Grey informed FBI agents and prosecutors that he worked in a "boiler room" selling shares of Pacific Shore Holdings, during which he joined a phone call with Anita Sgarro where he came to understand that Sgarro was a "closer" responsible for bringing in the top investors in Pacific Shore Holdings. Grey also stated that sales people made false and fraudulent statements to investors to sell Pacific Shore Holdings, including that it had a "$300 million valuation," and that the company would be listed on the NYSE "any day now." He also stated that none of the

> salespeople were licensed and that they specifically targeted senior citizens and non-accredited investors.

- Defendant Sgarro's former secretary, Marissa ("Mavi") Livni, informed FBI agents that Sgarro sold both Sanomedics and HBLI from the same offices, and provided agents with documents demonstrating that HBLI had negative revenues and paid over $250,000 in commissions and sales leads. Agents also acquired an email in which Sgarro specifically writes about "commission" paid for selling HBLI. This demonstrates that Sgarro's statement to victim Mr. Welch that "she received no commissions or fees and was only paid in shares of ADR/HBLI," was false, similar to misrepresentations about commissions she made concerning Sanomedics.

Sgarro essentially claims that she should be treated similar to certain of her co-Defendants who pled guilty and were only held accountable for the losses they personally caused, as opposed to the total loss proven at trial. She is wrong. Sgarro's codefendants received the benefit of bargained-for plea agreements that recommended certain loss calculations that are lower than hers. Sgarro did not receive this benefit because she denied her criminal culpability and wanted a trial. Sgarro forced the government to dedicate time and resources into proving the loss amount that was reasonably foreseeable to her. Because her pleading co-Defendants did not choose a trail, the government never had to expend the resources and develop the evidence necessary to hold them accountable for the same level of loss. For that reason, Sgarro should not have the benefit of the same bargain as her co-Defendants. *See United States v. Kalaycioglu*, 210 F. App'x 825, 834 (11th Cir. 2006) (upholding decision to consider "the loss attributable to [Defendant who went to trial] as an issue separate from the loss attributable to his codefendants" who pled guilty, and calculating Defendants' loss as greater); *United States v. O'Neil*, 118 F.3d 65, 75 (2d Cir. 1997) (rejecting argument "that it was improper to base the loss attributable to [Defendant] on the proceeds of the entire scheme, while allegedly equally culpable co-defendants who pled guilty had their loss calculations based upon their personal gain," explaining that "where some co-defendants plead guilty and others go to trial, sentencing disparity may well occur because the relevant sentencing

information available to the judge after [a] plea will usually be considerably less than that available after a trial.").

### c. Sophisticated Means

The PSI correctly allotted a sophisticated means enhancement for Sgarro under 2B1.1(b)(10)(C). "Sophisticated means" refers to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense," and ordinarily includes conduct such as hiding assets or transactions through the use of fictitious entities, corporate shells, or offshore financial accounts. U.S.S.G. § 2B1.1 cmt. 8(B). As an example, the Guidelines state that "in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means." *Id.*, cmt. (9)(B).

"There is no requirement that each of a defendant's individual actions be sophisticated in order to impose the enhancement. Rather, it is sufficient if the totality of the scheme was sophisticated." *United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010). Under a recent reworking of this Guideline enhancement the offense must involve conduct that the defendant "intentionally engaged in or caused the conduct constituting sophisticated means." U.S.S.G § 2B1.1(b)(10)(C).

In *United States v. Forehand*, 577 F. App'x 942, 944 (11th Cir. 2014), the Eleventh Circuit upheld application of the sophisticated means enhancement in an investment fraud case for conduct similar to Sgarro's conduct here. The court explained that "[f]or several years, [Defendant] solicited funds from investors and deposited them into an account owned solely by him doing business as USA Marketing," that "[m]ost of the money did not go to" the purpose told to investors and rather "went into [Defendant's] bank account [and] … was used by [Defendant] for his own

personal expenses and pleasures." Likewise, in *United States v. Dawson*, 588 F.App'x 890 (11th Cir. 2014), the defendant pled guilty to wire fraud for defrauding water and electric authorities. The Eleventh Circuit upheld the sophisticated means enhancement because the scheme was carried out over five years, the defendant used his managerial position, and he concealed his actions by transferring stolen money among multiple accounts. *Id*. at 893.

      The primary leaders of this $23 million fraud scheme—Craig Sizer, Mike Mesa, Anita Sgarro, and Charles Topping—worked together to meticulously plan, manage and conceal a sophisticated fraud that merits this sentencing enhancement. Sgarro in particular did whatever she could to hide her misconduct from law enforcement and regulators. Similar to *Forehand*, Sgarro received her commission payments through a shell corporation, and "[m]ost of the money did not go" towards Sanomedics and rather "was used by [Sgarro] for [her] own personal expenses and pleasures." *See* 577 F. App'x at 944. As in *Dawson*, Sgarro used her claimed "managerial position" as "Head of the West Coast Offices of Sanomedics" to perpetrate the fraud was paid through a shell corporation. *See* 588 F. App'x at 893. Sgarro also falsely represented that the Sanomedics stock would only be restricted from trading for a few months when she knew that investors could never sell, and used the false name "Anita Simone" in each of her fraud schemes to conceal her identity from investors. *See United States v. Vysniauskas*, 593 F. App'x 518, 531-32 (6th Cir. 2015) ("Our case law supports that such repeated use of false identities in an extensive and repetitive [fraud] scheme supports [the sophisticated means] enhancement"); *United States v. Evano*, 553 F.3d 109, 112 (1st Cir. 2009) (sophisticated means enhancement proper where defendant used multiple fake names and fake identifications to defraud companies and "undertook elaborate efforts to conceal his scheme"). One investor, Gerard Secker, testified that he told Sgarro

13

that he intended to report her to the authorities, to which Sgarro replied "if you report me to the authorities, I'll just deny it."

Sgarro's actions were sophisticated, and, based on the number of years she was able to further this fraud scheme, her attempts at alluding detection prevailed. The enhancement should apply.

### d. Role Enhancement

Sgarro was the "closer," "loader" and sole manager in the Sanomedics' California boiler room and a three level leader/organizer enhancement pursuant to § 3B1.1(b) is appropriate. The Guidelines require a three level enhancement to a defendant's base level offense if "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). "The guidelines commentary explains that district courts may consider a number of factors in assessing the defendant's role in the offense, including: the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *United States v. Cunningham*, 537 F. App'x 878, 880 (11th Cir. 2013) (citing U.S.S.G. § 3B1.1, cmt. 3). "The commentary factors are merely considerations for the sentencing judge, so there is no requirement that a certain number of factors be present for the enhancement to apply." *Id*. There must, however, ultimately be an "exertion of some degree of control, influence, or leadership." *Id*. (quotation marks omitted).

These factors strongly support applying this enhancement to Sgarro: (1) she was the only "closer" and account "loader" and was the manager with "decision making authority" in her own

14

California boiler room; (2) she claimed a "larger share of the fruits of the crime" than any co-conspirator besides Mesa and Sizer, earning 25% commissions and over $1 million from the fraud; (3) she interviewed and "recruit[ed] [her] accomplices," including Jeff Astgen and Marissa Livni; (4) she intricately "plann[ed], organiz[ed]," and instructed [her] co-conspirators on how to sell the Sanomedics stock, and; (5) the "nature and scope of [Sgarro's] illegal activity" was vast, spanning many years, 600 investors, and at least $20 million dollars. *See Cunningham*, 537 F. App'x at 880.

Sgarro claims that she worked under Mesa and thus was not a manager or supervisor. To the contrary, Sgarro single handedly managed an entire boiler room in California, interviewed and hired salespeople and secretaries, and was the only closer and account loader in her room. Mesa and Sgarro were *partners* and equals in this criminal scheme, evidenced by the fact that they split an even 25% of the investors' money as commissions. This alone qualifies her for the enhancement. *See Cunningham*, 537 F. App'x at 880 ("influence [Defendant] exerted over individuals by recruiting them into the [fraud] scheme was enough for [three point enhancement under] § 3B1.1(b) to apply.") (internal quotations omitted); *United States v. Thomas*, 446 F.3d 1348, 1355 n. 2 (11th Cir. 2006) (finding no clear error where the defendant received a role enhancement under § 3B1.1(a) based solely on the fact that he recruited others into the conspiracy).

Sgarro unquestionably held a key supervisory role in the vast $20 million Sanomedics fraud scheme, and the three point enhancement under § 3B1.1(b) should apply.

## CONCLUSION

Based on an Offense Level of 38 and Criminal History Category of I, Sgarro has a sentencing range of 235 to 293 months. Because the statutorily authorized maximum sentence for mail fraud is 20 years, the government recommends that Sgarro be sentenced to the maximum of

240 months (20 years) for her serious crimes. This sentence will serve to punish Sgarro and to deter others in South Florida from committing such egregious criminal acts.

        Respectfully submitted,

        BENJAMIN GREENBERG
        ACTING UNITED STATES ATTORNEY

        /s/ Roger Cruz
        Roger Cruz
        Assistant United States Attorney
        Florida Bar Number 157971
        99 Northeast 4th Street
        Miami, Florida 33132
        Telephone: 305-961-9207
        Facsimile: 305-536-4699
        Email: roger.cruz@usdoj.gov

        /s/ Ryan D. Tansey
        Ryan D. Tansey (A5502279)
        Kevin B. Hart (A5501875)
        Trial Attorneys
        United States Department of Justice
        450 5th Street, N.W.
        Washington, DC 20530

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

      /s/ Ryan D. Tansey
    Trial Attorney, U.S. Department of Justice